IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JUNIOR MASON,** : | **CIVIL ACTION** |
| **Plaintiff,** : | |
| : | **No. 14-cv-1372** |
| v. : | |
| : | |
| **SOUTHEASTERN PENNSYLVANIA** : | |
| **TRANSPORTATION AUTHORITY,** : | |
| **Defendant.** : | |

**MCHUGH, J.**                                                                                    **SEPTEMBER 18, 2015**

## MEMORANDUM

### I.   Introduction

In the case now before me, Plaintiff claims that his employer discriminated against him on the basis of race, and that his employer terminated his employment based upon illegitimate and pre-textual circumstances in violation of Title VII of the Civil Rights Act of 1964 (Title VII) and the Pennsylvania Human Relations Act (PHRA).  Defendant has moved for Summary Judgment on the ground that direct evidence of racial animus is remote in time, and in any event, the fellow employee who was allegedly biased was not a decision-maker in Plaintiff's termination.  Plaintiff responds that the manager who fired him acted in reliance on an investigation tainted by racial prejudice, essentially advancing a "cat's paw" theory of discrimination.

The evidence supporting Plaintiff's claims is marginally sufficient, but sufficient nonetheless.  Because there are material factual disputes, the Motion for Summary Judgment must be denied.

1

## II.     Summary of Facts

Plaintiff, Junior Mason, an African-American male, worked for Defendant, the Southeastern Pennsylvania Transportation Authority (SEPTA), from 2000 until his discharge in 2011.  SEPTA terminated Mason's employment after deciding that he had lied during an internal investigation and had attempted to bribe a witness.  *See* Def. Ex. 12, Grievance Hearing 6/26/2011.  SEPTA defends the termination as a legitimate employment decision, but Mason claims the investigator, SEPTA detective Kathleen Blankley, motivated by racial bias, falsified her investigation report and caused the termination.

The investigation at issue began in May, 2011.  Blankley received a report from an officer that Rashad Wroten, an individual with a history of stealing from SEPTA, had been spotted on SEPTA property driving Mason's truck.  Def. Ex. 9, Summary Investigative Report by Kathleen Blankley.  Blankley was directed to contact Mason (who was on vacation out of state) and inquire as to whether Mason had lent his truck to the individual or if it had been stolen. Dep. Blankley 13:23–14:6.  Blankley reported that Mason told her Wroten did not have permission to drive the truck and that he had left the truck at an auto shop.  Def. Ex. 9, Summary Investigative Report by Kathleen Blankley at 2.  Her report also claimed the auto shop owner called her the next day.  *Id.*  The shop owner reportedly told Blankley that he received a call from Mason in which Mason asked him to lie and say the truck had been stolen from the shop. *Id.*

The following Monday, Blankley interviewed Mason with two other SEPTA employees, finding "Mason contradicted himself several times in his statement."  *Id.*  The report states Blankley "advised [Mason] not to contact or talk to [the auto shop owner].  [Blankley] advised [Mason] that if he does contact, retaliate or has someone else retaliate against [the shop owner],

2

[Blankley] would arrest him for intimidating a witness." *Id.* Next, the report alleges the auto shop owner called Blankley several hours later. *Id.* at 3. The shop owner claimed Mason had contacted him and offered him five hundred dollars to lie to Blankley about the truck. *Id.* SEPTA does not dispute that it relied on this report when, in three separate hearings, SEPTA officials found Mason had lied during an investigation, disobeyed Blankley's no-contact order, and attempted to bribe a witness.

Mason contests the veracity of the report that became the basis for his discipline and termination. He contends that he was the subject of multiple instances of racially biased harassment by Blankley over a long period of time. Blankley's report, he argues, was the culmination of her biased campaign against him. He claims that the report contained false allegations invented for the purpose of motivating SEPTA to fire him.

Mason cites multiple encounters with Blankley that he says demonstrate her racial bias against him. He described an instance in 2008 in which Blankley approached Plaintiff while he was carrying a box to his car. Plaintiff had a Fraternal Order of Police medallion—a gift from a relative—on his license plate. Plaintiff claims Blankley objected to his possession of the medallion, telling him, "What the fuck are you doing with the F.O.P. thing on your license plate? … You're not a cop. … You're not allowed to have it, because you were locked up before." Dep. Mason 85:3–12. Blankley ordered Plaintiff to give her the medallion. *Id.* at 85:13. Mason recalled at deposition while Blankley walked away, "That's when she used that term 'dumb ni\*\*ers.' And then she said 'Just don't get it.' " *Id.* at 86:24–87:2. Mason claims Blankley frequently asked him, "Are you staying out of trouble?" and once hit him in the back of the legs with a briefcase, saying "You never know where I'll be." Dep. Mason 101:4–102:5. Mason explained why he felt Blankley's comments offended him: "Asking me if I'm staying out of

3

trouble.  I found that kind of offensive.  Like, she was trying to insinuate that I was a criminal or something."  *Id.* at 106:3–6.  With one exception, these comments were not overtly racist, but could be considered to embody cultural stereotypes derogatory towards African Americans - that they are law breakers who bear watching.

Mason described Blankley's investigation as threatening and biased.  He claims that during the investigation, Blankley frequently told him he was going to lose his job.  *Id.* at 130:1–12.  Mason recounted in deposition that after speaking with Blankley, he called the auto shop owner's assistant inquiring about the location of his truck.  *Id.* at 185:18–187:11.  According to Mason, later the same day the assistant called Mason and told him Blankley had telephoned and threatened Mason's job.  *Id.* at 187:4–8.[1]  The next day Mason spoke with the auto shop owner.  Mason claims the owner told Mason that Blankley had visited the shop and alleged Mason promised to get a SEPTA job for the shop assistant.  *Id.* at 193:12–21.  Mason further alleges the shop owner recounted that Blankley had threatened to shut down his business.  *Id.* at 237:21–238:6.  Mason flatly denies ever attempting to bribe the auto shop owner.  Plaintiff's Answers to Interrogatories at No. 1.

Mason asserts that during his interview with Blankley and other investigators, he did not have an opportunity to read the statement that Blankley recorded.  Dep. Mason 208:1–13.  He argues his statements were not accurately recorded.  "I never told them that I lent the truck to anybody, because I didn't.  These questions go from left field to right field."  *Id.*  236:10–13.  He also disputes SEPTA's claim that Blankley forbade him to have any contact with the auto shop owner.  Mason seems to claim that he understood the order to fall short of a blanket no-contact instruction.  "Well, she told me not to go over there, call him or harass him.  She didn't say,

---

[1] Mason's recounting of Blankley's purported conversation with the shop's assistant is classic hearsay.  I include it here to paint the picture of the litigants' dispute.  However, this comment and other hearsay comments play no role in my decision.

You're not allowed to have contact with [the shop owner] while my investigation is going on or X, Y and Z." *Id.* at 225:16–20.  Mason claims the shop owner called Mason, not the other way around, and that the call Mason received was his last contact with the owner of the auto shop.[2]

Mason does not dispute that he went through three separate hearings that reviewed Blankley's report, heard testimony from Mason, and ultimately upheld the termination decision. But he argues that Blankley's report—and Blankley herself—tainted the proceedings.  He claims that just before one hearing began, Blankley had a closed door conversation with the hearing officer and then left "smirking." *Id.* at 254:3–7.  The written memoranda from these proceedings state Mason admitted lying, but Mason counters the memoranda misstate what happened in the hearings.  In Mason's deposition, he explained that during the second hearing, "He asked me Why did I lie, and I said, 'I didn't lie about anything.  It was a miscommunication.' " *Id.* at 282: 10–12.[3]  In Blankley's deposition, she agrees she "may have" met with Joseph Horbury, one of the hearing officers the day of the hearing, though she does not recall whether or not she actually discussed Mason's hearing with the officer.  Dep. Blankley 92:20–93:20.  John Reynolds, who presided over another of Mason's hearings, recalls discussing the case with Blankley three or four times.  Dep. Reynolds 16:11–17:5.

Mason asks the court to infer from evidence in the record that he was the victim of illegal discrimination instigated by Ms. Blankley.  SEPTA maintains that the record shows nothing

---

[2]   Q. Who contacted who? Did he contact you, or did you reach out to him?
      A. He called me in the evening.  I told him I got suspended from work. ….
      Q. Was that the last time you—I understand that's the last time you talked on the phone.  Did you ever see him face to face after that?
      A. Never.
Dep. Mason at 238:10–241:9.

[3] *See also* Dep. Mason at 283:1822:
      Q. Okay. At any time during the second-level hearing did you tell Mr. Reynolds that you lied during the IG's investigation because you feared losing your job?
      A. No.

5

other than a legitimate termination after an investigation and multiple rounds of independent hearings.

### III. Standard of Review

   a. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win a summary judgment motion, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden … by showing that the nonmoving party's evidence is insufficient to carry that burden.' " *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Wetzel v. Tucker*, 139 F.3d 380, 383 n. 2 (3d Cir. 1998)). To survive summary judgment, "there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue under the governing substantive law." *Weightman v. Bank of New York Mellon Corp.*, 772 F.Supp.2d 693, 701 (W.D. Pa. 2011) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986)).

In making its decision, the court should "view the record in the light most favorable to [the non-moving party] and resolve all reasonable inferences" in the non-moving party's favor. *Jones v. School Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999) (citing *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 n.3 (3d Cir. 1998) (en banc). The court may not consider statements that would be inadmissible as hearsay at trial. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

   b. Title VII and the PHRA

Title VII's prohibition on unlawful employment practices provides, in part, "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any

6

individual … because of such individual's race …" 42 U.S.C. 2000e-2.  A plaintiff's burden when pursuing a PHRA claim is similar to his burden when pursuing a Title VII claim. "Generally, claims brought under the PHRA are analyzed under the same standards as their federal counterparts." *Kroptavich v. Pennsylvania Power and Light Co.*, 795 A.2d 1048, 1054 (Pa. Super. Ct. 2002) (applying the *McDonnell Douglas* burden-shifting framework to a PHRA claim).

   A plaintiff may litigate a claim of employment discrimination under Title VII under multiple theories of liability.  A plaintiff may prove his case with evidence that directly shows the employer engaged in unlawful discrimination.  For instance, in *Trans World Airlines, Inc. v. Thurston*, the Supreme Court found a policy that discriminated among employees based on their age was direct evidence of unlawful discrimination under the ADEA.  469 U.S. 111, 121 (1985). Alternatively, in the absence of direct evidence of discrimination, a plaintiff may attempt to prove that the defendant's stated legitimate reasons for an adverse employment action are merely pretexts for unlawful discrimination.  A plaintiff pursuing a pretext theory must navigate the *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Under the framework, a plaintiff must first establish a *prima facie* case of discrimination.  *Jones*, 198 F.3d. at 410; *See generally St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 502 (1993); *Burdine*, 450 U.S at 248; *McDonnell Douglas Corp.*, 411 U.S. at 792.  In the absence of direct evidence that the employer's decision was motivated by discriminatory animus, a plaintiff may produce indirect evidence that creates an inference of discrimination.  *See Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).  In effect, a *McDonnell Douglas* theory of liability is a fallback theory to which an employee may resort where the evidence of

discrimination depends upon logical inference rather than direct proof.  *See Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir 2011).

Specifically, the *McDonnell Douglas* framework requires Plaintiff to establish four essential elements to satisfy his burden: (1) that Plaintiff is a member of a protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment action; and (4) that the action occurred under circumstances that give rise to an inference of unlawful discrimination.  *Jones*, 198 F.3d at 411.  The fourth prong, which is the only element in dispute in the instant case, can be proven by illustrating that members outside of the protected class engaged in the same conduct as Plaintiff but were treated more favorably by the employer.  *See Bennun v. Rutgers State University*, 941 F.2d 154, 170 (3d Cir. 1991).

If Plaintiff makes his prima facie case, the burden of production shifts to Defendant to rebut the presumption of discrimination by offering a compelling, legitimate, and non-discriminatory reason for the decision to terminate employment.  *See Hicks*, 509 U.S. at 507; *Jones*, 198 F.3d at 412; *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).  If Defendant is able to rebut the presumption raised by the prima facie case, the burden shifts back to Plaintiff to demonstrate that Defendant's purported reason for termination was mere pretext for unlawful discrimination.  *Fuentes*, 32 F.3d at 764; *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998).

The Third Circuit has recently joined other circuit courts in recognizing that a defendant may be liable under a "cat's paw" theory of unlawful discrimination.[4]  Under this theory, an

---

[4] The term, "cat's paw" derives from a fable of a monkey who employs flattery to convince a cat to pull chestnuts out of a fire.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011).  "Today the term 'cat's-paw' refers to 'one used by another to accomplish his purposes.' … In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."  *E.E.O.C. v. Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006).

employer may be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case. *McKenna v. City of Philadelphia*, 649 F.3d 171, 178 (3d Cir. 2011).

In a case based on indirect evidence of discriminatory animus, the Tenth Circuit explained what a plaintiff must prove to succeed under a "cat's paw" (or "subordinate bias," to use the Tenth Circuit's term) theory of discrimination:

> To survive summary judgment on a subordinate bias theory, the plaintiff must first establish a genuine issue of material fact concerning the bias of the subordinate. It must then establish genuine issues of material fact as to whether the proffered reason for the employment action is pretextual, which in a subordinate bias claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision.

*Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d at 488. As described by the Tenth Circuit, a plaintiff's burden pursuing a "cat's paw" theory of liability is only slightly modified from his burden in a more typical *McDonnell Douglass* case.

For practical purposes, in a "cat's paw" case, if the evidence is viewed under a theory of direct discrimination, the plaintiff does not so much argue personal bias on the part of the ultimate decision-maker, but rather that one or more persons involved deliberately tainted the decision-making process to bring about a discriminatory result. If the evidence is analyzed under the *McDonnell Douglass* inferential standard, the argument is not quite that the decision makers invented a pretext for termination, but rather that they acted on the basis of a false premise because the information on which they relied was tainted by racial animus.

**IV.     Discussion**

Although the evidence is far from overwhelming, I find that Plaintiff has produced sufficient evidence to survive summary judgment. As explained in greater detail below, I find

that Plaintiff has produced evidence of material disputes of fact over whether Blankley acted with bias when reporting that Plaintiff engaged in misconduct. Plaintiff has also shown there is a material factual dispute as to whether SEPTA's proffered reason for terminating Plaintiff was pre-textual because it was Blankley's biased conduct that in fact caused Plaintiff's termination. Depending upon the jury's assessment of the evidence, it might conclude that there was direct discrimination in the form of Detective Blankley personally lobbying the decision-makers, or that discrimination can be inferred because the basis for termination was tainted. For purposes of summary judgement, if Blankley's investigation was tainted by racial bias, and her investigation was the basis for Plaintiff's termination, then her bias can be deemed a causal factor in his termination.

SEPTA contends that any racially offensive comment by Detective Blankley is at most a "stray remark" that does not suffice to establish racial animus. "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Fuentes v. Perskie*, 32 F.3d 759, 767 (3d Cir. 1994) (citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)). Ironically, the "stray remarks" doctrine itself grew out of a stray remark in a concurring opinion by Justice O'Connor in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277 (1989). *Price Waterhouse* was a mixed motive case, brought under a theory of liability since superseded by the 1991 Civil Rights Act. 42 U.S.C. Section 2000e-2(m). Justice O'Connor opined that "statements by non-decision-makers, or statements by decision-makers unrelated to the decisional process itself," would not suffice to show "direct evidence" of discrimination. 490 U.S. at 277. From that modest beginning, it has expanded exponentially to encompass a broad array of discrimination cases. *Diaz v. Jiten Hotel Management, Inc.*, 762 F.

Supp. 2d 319, 333–338 (D. Mass. 2011). The risk with the doctrine is that it can be too facile, serving as a shorthand conclusion that fails to take into account the nuances of the entire record.

One commentator has described it as a "series of loosely bound doctrines and casual labels that different courts assign to proffered evidence of discrimination that they planned to discount or ignore." Kerri Lynne Stone, *Taking in Strays: A Critique of the Stray Comment Doctrine in Employment Discrimination Law*, 77 MO. L. REV. 149, 159 (2012). Prof. Stone's analysis of the different meanings applied by different courts provides a useful template for evaluating the potential significance of a remark in a given case. Among the various iterations are: "1) the remark(s) were made by one too removed from the decision-making process at issue; (2) the remark(s) were isolated, as opposed to part of a broader pattern of comments tending to evince bias; (3) the remarks were not made with sufficient temporal proximity to the adverse action at issue in the suit; (4) the remark(s) are too ambiguous to be clearly probative of discriminatory bias; or (5) the remark(s) were too contextually attenuated from the adverse action at issue in the suit to be reflective of discriminatory bias." *Id.* at 159–160.[5]

Applying such a matrix here, I cannot conclude that there is no material issue of fact for a jury. Detective Blankley was not the decision-maker, but she was hardly removed from the decision-making process, as her investigatory report was the basis for termination. As noted above, in a "cat's paw" case the fairness of any given decision is a function of the fairness of the input given to the decision-makers. Detective Blankley's use of a particularly offensive racial insult might have been isolated, but it was accompanied by ongoing comments that could be reflective of racial prejudice. Her use of the epithet was comparatively remote in time, but that factor is offset by her other continuing comments. The remark is hardly ambiguous when it

---

[5] Logically, the doctrine has more persuasive force in a hostile work environment case, where a central question is the pervasiveness of the discriminatory conduct.

comes to racial prejudice, as it has been described as the "paradigmatic slur" toward African Americans and the "most socially consequential insult." Randall Kennedy, NIGGER: THE STRANGE CAREER OF A TROUBLESOME WORD, (Pantheon Books, 2002), at 27, 32. Blankley's frequent questions to Mason about whether he was "staying out of trouble," and her comments about his criminal record may not, by themselves, demonstrate racial animus. However, the use of the racial epithet could lead a jury to view these other incidents in a different light and view Blankley's conduct as embodying negative stereotypes of African Americans. Finally, the prejudiced remarks in question were allegedly made about the characteristics of African Americans generally—they "just don't get it." As such, a jury might conclude that there were ongoing and deep seeded biases harbored by the investigating officer skewing the findings of her investigation. When that is coupled with the further allegations of her direct communication with at least two of the decision-makers around the time of the pertinent hearings, the ultimate validity of Mason's case depends upon the jury's assessment of the evidence.

In that regard, I find it worth noting that Justice O'Connor, whose use of the phrase sparked the stray remark doctrine, later took pains to reinforce that credibility assessments are the province of the jury. In *Reeves v. Standard Plumbing Products, Inc.*, in reinstating a jury verdict for an employee in an age discrimination case, Justice O'Connor criticized the Fifth Circuit for discounting the significance of a seemingly isolated comment, because a court should not "impermissibly substitute its judgment concerning the weight of the evidence for the jury's." 530 U.S. 133, 153 (2000).

SEPTA objects that any evidence of animus is not sufficiently "direct." It cites, for example, to Third Circuit case law from 1994 which states, "evidence is not direct where the trier of fact must *infer* the discrimination on the basis of age from an employer's remarks." *Torre v.*

*Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994); *see also, Byrd v. City of Philadelphia*, No. 12-4520, 2014 WL 5780825 at *4 (E.D. Pa. Nov. 6, 2014) (citing to *Price Waterhouse*, 490 U.S. 228, for the rule that establishing discrimination without burden-shifting requires "direct" evidence). If Mr. Mason's testimony about Detective Blankley's comments is believed, I do not see where it would be difficult for a jury to infer the existence of racial bias.

Plaintiff has also produced evidence that would permit a jury to conclude Blankley's bias caused Plaintiff's termination. SEPTA does not dispute that it relied on Blankley's report, though it disagrees with Plaintiff's accusations of Blankley's bias and influence on the termination process. Defendant's Reply in Further Support of its Motion for Summary Judgment at 4 ("Obviously, Det. Blankley's report was the basis for SEPTA's decision to terminate Plaintiff's employment."). Plaintiff's argues that Blankley invented allegations against him, in particular the very serious allegation that he offered to bribe a witness to the investigation. He also denies that he violated Blankley's order about contacting the same witness. These fabrications, Mason argues, became the flawed basis for the termination hearings that followed. Mason also suggests Blankley influenced the hearings themselves by pointing to possible contacts between Blankley and hearing officials.

If Plaintiff's claims and denials are accurate, this case resembles *McKenna v. City of Philadelphia*, the case in which the Third Circuit recognized the viability of "cat's paw" discrimination claims. 649 F.3d at 178. In *McKenna*, a police officer named Ray Carnation had repeatedly complained to the captain of his district that Carnation's sergeant was creating a racially hostile work environment. *Id.* at 173. Carnation also complained that the captain was contributing to the environment by failing to address the issue. *Id.* Soon after, the captain brought disciplinary charges against Carnation. *Id.* at 174. A Police Board of Inquiry (on which

13

Carnation's captain did not sit) upheld the charges against Carnation and recommended his dismissal. *Id.* at 175. The Commissioner accepted the recommendation. *Id.* Carnation filed suit alleging retaliation. The Third Circuit rejected the defense argument that even if racial bias motivated Carnation's captain, that bias could not cause Carnation's termination because an independent board "severed the causal connection" between bias and termination. *Id.* at 178. Instead, the court explained that in a "cat's paw case," "the correct test of employer liability was one of proximate cause." *Id.* at 177. "Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect." *Id.* at 178. The court concluded that in that case, although Carnation's captain did not make the final termination decision himself, "a reasonable jury could conclude that Colarulo's animus bore a direct and substantial relation to Carnation's termination and that the PBI's recommendation was not independent and was foreseeable." *Id.* at 179.

Whether Plaintiff's claims and denials are accurate is not the question before me. Much will depend on the jury's assessment of the credibility of the witnesses. If a jury found Plaintiff's evidence to be credible, "a reasonable jury could conclude that [Blankley's] animus bore a direct and substantial relation to [Mason's] termination," that the three hearings were "not independent," and that Mason's termination was a "foreseeable" result of Blankley's purportedly incorrect report. *McKenna*, 649 F.3d at 179. This is enough to survive summary judgment.

## V.     Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied. An appropriate order follows.

                                                  /s/ Gerald Austin McHugh
                                              United States District Court Judge